RECEIVED
JAN 1 1 2010
U.S.D.C. S.D. N.Y.
CASHIERS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SUMMIT ENTERTAINMENT, LLC,     :

          Declaratory Judgment Plaintiff,    :

          v.                        :

ERGOARTS, INC. and
ELLEN RIGAS VENETIS,         :

          Declaratory Judgment Defendants.   :

**COMPLAINT FOR
DECLARATORY JUDGMENT**

Civil Action No.: _____

Plaintiff, Summit Entertainment, LLC ("Summit" or "Plaintiff"), as and for its Complaint for Declaratory Judgment against defendants, Ergoarts, Inc. and Ellen Rigas Venetis (collectively, "Defendants"), alleges as follows, upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters:

## THE PARTIES

1.     Summit is a Delaware limited liability company having its principal place of business in Santa Monica, California.

2.     Ergoarts, Inc. ("Ergoarts"), formerly known as Rigas Entertainment Ltd., is a New York corporation having its principal place of business in New York, New York.

3.     Ellen Rigas Venetis ("Venetis") is an individual residing in New York, New York.

4.     Ergoarts was organized by or at the direction of Venetis. Venetis personally controls and directs, and has controlled, directed, instigated and, in some cases, personally performed, the acts and activities of Ergoarts described herein; is individually the moving, active

and conscious force behind such acts; is individually the sole beneficiary of such acts and activities; and has acted jointly with Ergoarts in connection with such acts and activities.

## JURISDICTION AND VENUE

5.    This is a declaratory judgment action pursuant to the Federal Declaratory Judgment Act, 15 U.S.C. §§ 2201-02; the Copyright Act, 17 U.S.C. § 101 *et seq.*; and the Trademark Act, 15 U.S.C. § 1051 *et seq.*  Subject matter jurisdiction is therefore conferred upon this Court by federal statute pursuant to 28 U.S.C. § 1331.  Subject matter jurisdiction is further conferred upon this Court under 28 U.S.C. § 1367 with respect to the state statutory and common law claims that form part of the same case and controversy as those federal claims that are subject to this Court's jurisdiction.  In addition, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as this action concerns an amount in controversy that exceeds $75,000, exclusive of costs and interest, and is between citizens of different states.

6.    Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants reside in this Judicial District; are doing and transacting business in this Judicial District; and a substantial portion of the events at issue have arisen and continue to occur in this Judicial District.

## FACTS

7.    Summit is a well-known and highly successful company in the motion picture industry.  Since 1991, Summit and its predecessors have been involved in the production, financing and distribution of films and related entertainment products, including such world famous movies as *Memento, Vanilla Sky, Michael Clayton, Mr. and Mrs. Smith,* and *Knowing.*

8.    Summit has recently made headlines internationally as the producer and distributor of the immensely popular *Twilight* series of films, based on the vampire-romance novels of Stephenie Meyer.

9.      Summit is currently producing a romantic comedy set to be released theatrically in May 2010 with a working title of *Letters to Juliet* (the "Motion Picture"), starring Amanda Seyfried and Vanessa Redgrave. The backdrop for the Motion Picture is the Italian City of Verona, the setting of William Shakespeare's famous tragedy, *Romeo and Juliet*.

10.     At the turn of the last century, tourists visiting the Franciscan monastery which was fictionalized by Shakespeare as the tomb of his heroine, Juliet Capulet, would leave notes seeking her advice on the topic of love. Word of the practice quickly spread, and soon the letters began pouring in from all over the world. In the late 1930s, the original caretaker of the tomb, Ettore Solimani ("Solimani"), took it upon himself to answer these letters to Juliet, and so began a time-honored tradition for the City of Verona that exists to this day. Thereafter, several other Veronese residents assumed the role of "Secretary" to Juliet—either writing themselves or working with others to respond to the letters. A Verona resident named Giulio Tamassia ("Tamassia") became the Secretary in 1989, and he relied upon his staff of letter-writers whom he called the "Club di Giulietta." Like the prior Secretaries, Tamassia's group is devoted to the legend of Juliet, and—acting with the permission of the City of Verona—now answers thousands of letters sent to Juliet each year.

11.     The Juliet letter-writing phenomenon has been the topic of countless media stories, non-fiction works, a documentary film, a novel, and even songs, all of which further spread the word of the tradition across the globe. For example, the phenomenon has been reported in such notable publications as *The New York Times*, *The Wall Street Journal* and *The Washington Post*. (True and correct copies of representative articles are attached hereto as Exhibit "A".)

12.    A non-fiction book on the subject, entitled *Letters to Juliet*, by Lise Friedman and Ceil Friedman (the "Friedmans"), was published in 2006 (the "Book"). The Book recounts, among other things, the origins and history of the tragic tale of Romeo and Juliet, the fabled City of Verona, and the letter writing/answering tradition (as observed by various Secretaries), and provides samples of actual love letters written to Juliet over the years. In the course of writing the Book in 2004 and early 2005, the Friedmans interviewed the surviving children of Solimani and Gino Beltramini, another prior Secretary, and conducted historical research in the Verona libraries. During that time, the Friedmans also interviewed Tamassia and read hundreds of letters stored in the Club di Giulietta's archives.

13.    Using this well chronicled, centuries-old tradition as the background for Summit's fictional film, the Motion Picture centers on the fictional character Sophie Hall, a young American woman (played by Amanda Seyfried) who travels to Verona. While in the courtyard of Juliet's tomb, she happens upon an old letter to Juliet dated 1951, tucked away in a forgotten corner, written by the fictional character Claire Smith (played by Vanessa Redgrave). Sophie feels compelled to write to Claire on behalf of Juliet; "Juliet's" answer inspires Claire to come to Italy in search of her long-lost love. The Motion Picture portrays the fictional story of the two women as each seeks and finds love brought into their lives.

14.    The screenplay (the "Screenplay") of the Motion Picture was written by Jose Rivera, writer of the critically acclaimed film *The Motorcycle Diaries*.

15.    The Motion Picture was first publicly announced in October 2006. (A true and correct copy of the article appearing on October 30, 2006 in the entertainment daily publication *Variety* is attached hereto as Exhibit "B".) A description of the Motion Picture has been posted

on Summit's website since May 12, 2009. (A true and correct copy of this website page is attached hereto as Exhibit "C".)

16.     Summit has invested tens of millions of dollars in the production of the Motion Picture, and anticipates it will spend additional tens of millions of dollars to advertise and promote the Motion Picture in the coming months before its theatrical release.

## THE EXISTENCE OF AN ACTUAL CONTROVERSY

17.     Ergoarts is a production company with only one film to its credit, a 2000 release entitled *Songcatcher*.

18.     In or about the mid-1990's, Defendants purportedly secured exclusive rights to the life story of Tamassia and the story of the Club di Giulietta, and to the consultancy services of Tamassia and the Club di Giulietta, in hopes of developing a fictional book, screenplay or film based thereon.

19.     In June 2006, Applehead Pictures LLC ("Applehead"), a New York City-based film production company, entered into an agreement with the Friedmans, under which Applehead obtained an option (the "Option") to acquire motion picture and certain ancillary rights in and to the Book for a period of time (the "Option Agreement"). Contemporaneously therewith, Applehead assigned its rights under the Option Agreement to Summit.

20.     On June 14, 2006, Defendants, acting through counsel, wrote to the literary agent for the Friedmans, complaining that any fictional book or film pertaining to the Club di Giulietta would infringe Defendants' rights. (A true and correct copy of this letter is attached hereto as Exhibit "D".)

21.     On January 9, 2007, Defendants, acting through new counsel, again wrote to the Friedmans, alleging that "it appears as if the authors have collaborated extensively with

Tamassia and the Club in the creation of the Book"; claiming that the Book violated Defendants' rights and their relationship with Tamassia and the Club di Giulietta; and demanding the cessation of such purported violations. (A true and correct copy of this letter is attached hereto as Exhibit "E".)

22.    On January 9, 2007, Defendants, acting through this same counsel, wrote to Summit, alleging that Summit's "film project based on the Book" violated Defendants' rights and their relationship with Tamassia and the Club di Giulietta; asserting that Venetis had previously discussed the subject of a Juliet film project with Caroline Kaplan ("Kaplan"), a principal of Applehead; and demanding the cessation of such purported violations. (A true and correct copy of this letter is attached hereto as Exhibit "F".)

23.    The Friedmans vigorously deny Defendants' allegations. Without limitation, the Friedmans had no knowledge of any alleged relationship or agreement among Tamassia, the Club di Giulietta and Defendants at the time they interviewed Tamassia and obtained information from the Club di Giulietta for their Book.

24.    Applehead vigorously denies Defendants' allegations regarding any purported dealings between Venetis and Kaplan regarding a Juliet film project.

25.    Summit acquired Applehead's Option to the Book because Summit intended to use the Book as historical background source material for the Motion Picture. However, because Defendants' threats against Summit were primarily based upon Summit's connection to the Book through the Option Agreement, and, in turn, upon the Friedmans' contacts with Tamassia and the Club di Giulietta, Summit chose not to exercise the Option to the Book; chose not to use the Book as source material for the Motion Picture; and instead obtained alternate source materials and rights directly from the City of Verona.

26.     Summit continues to be threatened by Defendants.  For example, in November 2008, Defendants' second counsel reiterated to Summit's counsel by email that if Summit elected "to continue to maintain that its activities do not run afoul of my clients' rights, [it] is proceeding at its own peril," and that "[r]est assured that my clients will remain vigilant in protecting their rights, and will take whatever action they deem necessary to protect them." (True and correct copies of these emails are attached hereto as Exhibit "G".)  Defendants' demands have recently been expressed by yet a third counsel to Summit's counsel via phone.

27.     Summit vigorously denies Defendants' above-described allegations and claims.

28.     Summit has tried to amicably resolve this dispute, without success.

29.     An actual controversy therefore exists between Summit and Defendants relating to the Motion Picture.  Defendants' claims continue to be a potential obstacle to the release of the Motion Picture.  Specifically, Summit remains concerned that Defendants will-- as they have threatened to do-- take action against the distribution and exhibition of the Motion Picture as its release date approaches, thereby jeopardizing Summit's substantial investment in the Motion Picture.

## COUNT I

### Declaratory Judgment — Copyright in the Screenplay and the Motion Picture

30.     Plaintiff incorporates by reference its allegations in paragraphs 1-29 above.

31.     This count arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*

32.     The Screenplay and the Motion Picture are original works, which make only cursory reference to historical and factual information regarding the Juliet letter-writing phenomenon, all of which exists in the public domain, as a mere backdrop for the story about two womens' journey seeking love.

33.    All copyright and other rights in and to the Screenplay and the Motion Picture are owned exclusively by Plaintiff and its subsidiaries.

34.    Plaintiff has not copied any work authored or owned by Defendants.

35.    Plaintiff (as well as writer Jose Rivera) did not have access to any work authored or owned by Defendants.

36.    There is no substantial similarity between the Screenplay or Motion Picture, on the one hand, and any work authored or owned by Defendants, on the other hand.

37.    Accordingly, Plaintiff seeks a declaration that the Screenplay and the Motion Picture do not infringe or violate any copyright rights owned by Defendants.

## COUNT II

### Declaratory Judgment — No Tortious Interference with Contract

38.    Plaintiff incorporates by reference its allegations in paragraphs 1-37 above.

39.    This count arises under the common law of the State of New York.

40.    Plaintiff has not interfered with any alleged contractual relationship among Defendants, Tamassia, and the Club di Giulietta.

41.    The Friedmans were unaware of any alleged relationship or agreement among Tamassia, the Club di Giulietta and Defendants at the time they interviewed Tamassia and obtained information from the Club di Giulietta for their Book in 2004 and early 2005.  In any event, Plaintiff did not exercise the Option to the Book, and has obtained source materials and information for the Motion Picture directly from the City of Verona.

42.    Plaintiff has not acquired or used any rights, information, properties or services of Tamassia or the Club di Giulietta belonging to Defendants.

43.    The Screenplay and the Motion Picture do not make use of any rights, information, properties or services belonging to Tamassia or the Club di Giulietta, or belonging

to Defendants as the purported licensee of or successor-in-interest to Tamassia and/or the Club di Giulietta.

44.    All of Plaintiff's activities have been in furtherance of its own business purposes and interests.

45.    Any claim by Defendants for tortious interference with contract is time-barred by the three year limitations period applicable to such claims under NY CPLR § 214.

46.    Accordingly, Plaintiff seeks a declaration that it has not tortiously interfered with any of Defendants' purported contractual relationships, and/or that any such tortious interference claim of Defendants is time-barred.

## COUNT III

### Declaratory Judgment — No Tortious Interference with Prospective Economic Advantage

47.    Plaintiff incorporates by reference its allegations in paragraphs 1-46 above.

48.    This count arises under the common law of the State of New York.

49.    Plaintiff has not interfered with any alleged prospective economic advantage of Defendants in relation to Defendants' purported dealings with Tamassia and the Club di Giulietta.

50.    The Friedmans were unaware of any alleged relationship or agreement among Tamassia, the Club di Giulietta and Defendants at the time they interviewed Tamassia and obtained information from the Club di Giulietta for their Book in 2004 and early 2005.  In any event, Plaintiff did not exercise the Option to the Book, and has obtained source materials and information for the Motion Picture directly from the City of Verona.

51.    Plaintiff has not acquired or used any rights, information, properties or services of Tamassia or the Club di Giulietta belonging to Defendants.

52.    The Screenplay and the Motion Picture do not make use of any rights, information, properties or services belonging to Tamassia or the Club di Giulietta, or belonging to Defendants as the purported licensee of or successor-in-interest to Tamassia and/or the Club di Giulietta.

53.    All of Plaintiff's activities have been in furtherance of its own business purposes and interests.

54.    Any claim by Defendants for tortious interference with prospective economic advantage is time-barred by the three year limitations period applicable to such claims under NY CPLR § 214.

55.    Accordingly, Plaintiff seeks a declaration that it has not tortiously interfered with any prospective economic advantage allegedly belonging to Defendants, and/or that any such tortious interference claim of Defendants is time-barred.

**COUNT IV**

**Declaratory Judgment — No Violation of Tamassia's Privacy or Publicity Rights**

56.    Plaintiff incorporates by reference its allegations in paragraphs 1-55 above.

57.    This count arises under New York Civil Rights Law §§ 50 and 51.

58.    The Screenplay and the Motion Picture do not make use of Tamassia's name, portrait, picture or voice.

59.    Any claim for infringement or violation of Tamassia's right of privacy or publicity asserted by Defendants (as the purported licensee of or successor-in-interest to Tamassia) is time-barred by the one year limitations period applicable to such claims under NY CPLR § 215.

60.    Accordingly, Plaintiff seeks a declaration that it has not infringed or violated any rights of privacy or publicity belonging to Tamassia, or to Defendants as purported licensee of or

successor-in-interest to Tamassia, and/or that any such privacy or publicity claim of Defendants is time-barred.

## COUNT V

### Declaratory Judgment — No Trademark Infringement

61.    Plaintiff incorporates by reference its allegations in paragraphs 1-60 above.

62.    This count arises under the Trademark Act, 15 U.S.C. § 1051 *et seq.*, the New York General Business Law, and New York common law.

63.    The Screenplay and the Motion Picture make no mention of the Club di Giulietta.

64.    Accordingly, Plaintiff seeks a declaration that it has not infringed or violated any trademark or trade name rights belonging to the Club di Giulietta, or to Defendants as purported licensee of or successor-in-interest to the Club di Giulietta.

## COUNT VI

### Declaratory Judgment – No Breach of Implied Contract or Idea Misappropriation

65.    Plaintiff incorporates by reference its allegations in paragraphs 1-64 above.

66.    This count arises under the common law of the State of New York.

67.    There is no contractual, quasi-contractual or other legal relationship between Plaintiff and Defendants.

68.    The factual information contained in the Screenplay and the Motion Picture relating to the Juliet letter-writing phenomenon is within the public domain and generally known to the whole world.

69.    The idea of a fictional story based on the historic Juliet letter-writing phenomenon is not proprietary to Defendants.

70.    Plaintiff did not misappropriate any property right belonging to Defendants.

71.    Any claim by Defendants for idea misappropriation is time-barred by the three year limitations period applicable to such claims under NY CPLR § 214.

72.    Accordingly, Plaintiff seeks a declaration that it has not breached any purported contract or quasi-contract, or misappropriated any alleged property right of Defendants, and/or that any idea misappropriation claim of Defendants is time-barred.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Summit Entertainment, LLC respectfully prays that this Court enter judgment for Plaintiff Summit Entertainment, LLC on each and every count, and further that this Court:

A.    Declare that Plaintiff's Screenplay and Motion Picture do not infringe or violate any copyright rights owned by Defendants.

B.    Declare that Plaintiff has not tortiously interfered with any purported contractual relationship among Defendants, Giulio Tamassia, and the Club di Giulietta, and/or that any such tortious interference claim of Defendants is time-barred.

C.    Declare that Plaintiff has not tortiously interfered with any alleged prospective economic advantage of Defendants in relation to Defendants' purported dealings with Giulio Tamassia and the Club di Giulietta, and/or that any such tortious interference claim of Defendants is time-barred.

D.    Declare that Plaintiff has not infringed or violated any rights of privacy or publicity belonging to GiulioTamassia, or to Defendants as purported licensee of or successor-in-interest to Giulio Tamassia, and/or that any such privacy or publicity claim of Defendants is time-barred.

E.     Declare that Plaintiff has not infringed or violated any trademark or trade name rights belonging to the Club di Giulietta, or to Defendants as purported licensee of or successor-in-interest to the Club di Giulietta.

F.     Declare that Plaintiff has not breached any purported contract or quasi-contract between Plaintiff and Defendants, or misappropriated any alleged property right of Defendants, and/or that any idea misappropriation claim of Defendants is time-barred.

G.     Award to Summit Entertainment, LLC its attorney's fees, costs, and such other and further relief as this Court may deem just and proper.

Dated: _January 11, 2010_

By: _____

Jonathan D. Reichman (JR-3243)
Michelle M. Marsh (MM-1494)
KENYON & KENYON LLP
One Broadway
New York, New York 10004
Phone: (212) 425-7200
Fax.: (212) 425-5288
Email: jreichman@kenyon.com
mmarsh@kenyon.com

Attorneys for Plaintiff
Summit Entertainment, LLC

# EXHIBIT A

# Verona Journal; Dear Juliet: Let Me Tell You About My Problem

By ALAN COWELL,

**VERONA, Italy—** O Romeo, Romeo. Wherefore art thou Romeo? Or Omer, or Tony? Juliet's not the only person who'd like to know.

Last year, some 2,000 letters from the lovelorn across the globe arrived in this northern Italian city that Shakespeare endowed with fame beyond its Roman antiquities, addressed either to Juliet Capulet or, since she was secretly wed by the time she died, to Juliet Montague.

And many of them ask the same question, albeit modified for different loves, that Juliet posed four centuries ago in Shakespeare's romantic tragedy set in this same town: Wherefore, or why, does love's faithful vow so often bind together couples whose families do not want them bound? Why is romance so tricky?

To scholarly purists, the Club of Juliet — a private organization that receives, translates and answers Ms. Capulet's mail — may simply be perpetuating a myth that Verona has promoted since the late 19th century in the interest of drawing visitors to spend their money here. Juliet's Recent Residence

First, there is what the official city guidebook assures the visitor is Juliet's villa in Via Cappello: "Tradition has it that this was the house of the Capulets, the powerful Veronese family to which Juliet belonged."

But according to Giulio Tamassia, the president of the Club of Juliet, the 13th-century edifice was deemed to be Juliet's place only in the 1880's or the 1890's when a group of notables decided to purchase it.

"They wanted it to become the house of Juliet," said Mr. Tamassia, the retired head of a confectionery business, "because the myth of Juliet seemed threatened."

Even the street name seems to have been a bit of a guess. "Via Cappello is similar to Capuleti," Mr. Tamassia said, using the Italian name for the Capulets, Juliet's family, which was locked in a feud with Romeo's Montagues. Since the Italian word cappello means hat, and since the building on Via Cappello is marked by a hatter's emblem, he reasoned, "It could be the house of the Capulets — they could have been a family of hat merchants." The Balcony Question

Then came the vexing question of the balcony. "Romeo and Juliet" simply would not be "Romeo and Juliet" without the balcony, even though Shakespeare's text refers only to "Juliet at a window above" after Romeo vaults over a wall into the Capulets' orchard.

The only problem was that the house on Via Cappello did not have a balcony until the 1920's, when, according to Mr. Tamassia, one was taken from another building of the same period and affixed to "Juliet's villa." Even Juliet's tomb is said by some to have been constructed from a horse trough.

But the municipal legerdemain seems to have worked. In 1937, the first of 10,000 letters sent over the years to "Juliet, Verona" arrived from an Englishman.

At first, various Veronese took it upon themselves to answer the mail. Then, a couple of years ago, Mr. Tamassia conceived the idea of the Club of Juliet, and enlisted students from the university here to help with translation and replies.

"The writers are often lonely people," said Laura Zanitti, one of two Italians who along with students from Mexico, Japan, China and Georgia read the heroine's mail and sign their replies as "Juliet's Secretary." Psychologist Consulted

"We ask ourselves what do they need," Miss Zanitti said. "We try to give a personal answer and try to understand the sender." Sometimes they consult a local psychologist.

They also organized an annual competition for the best letter. The first prize was awarded in February to Chiara Cabassi, a 20-year-old Italian university student from Parma. Her letter described a more diffident Romeo than Shakespeare's who "does not know how to speak to me of love" and whose "dark eyes" leave her almost speechless.

Of the 2,000 letters the club received last year, 600 were from Italy, and the rest from all around the world. Four-fifths are from women troubled by a Romeo they have already met. None, so far, have been vulgar, and the nature of their ardor reflects cultural influences, Mr. Tamassia said.

"The Turks are very serious," Miss Zanitti said. "The Latin Americans are the most passionate. The letters from the Arab world are playful and superficial. They invite Juliet to big palaces where luxury solves every problem. They invite her to come and play their new Nintendo."

Some letters recount stories reminiscent of the medieval Italian saga that scholars believe inspired Shakespeare.

"We seem to have something in common; we have fallen in love with men our fathers do not approve of us even to speak with," a 15-year-old high school student wrote from Chicago. Her tale was grim: she was two months pregnant, she said, and her boyfriend, Tony, "the leader of a big gang," is in jail.

"The reason he is in jail is stupid," she said. "One day when his head was full of thoughts of him and me, he sold some drugs to an undercover police officer." A Pakistani Feud

A Pakistani woman living in Saudi Arabia wrote of her love for Omer, a man whose family had been locked in a feud with hers for two generations. "What should I do?" she asked.

The reply, Mr. Tamassia said, was simple: She and Omer should emigrate to the West, and be married.

Of all the letters, Mr. Tamassia said, only around 5 percent are addressed to Romeo, and they do not always have the silver-sweet sound of lovers' voices.

"Why are you going to kill yourself for a Capulet?" an 18-year-old university student from Amman, Jordan, wrote to Romeo from a region steeped intractable divisions. "She is your enemy. Remember, you are a Montague, and Montagues hate Capulets. So that even shows that you are a lot sillier than I thought."

Photo: Shakespeare mentioned a window. But tradition has it that a balcony separated Romeo and Juliet in Verona. So in the 1920's a balcony was taken from a building of the same period and affixed to "Juliet's villa." (Marco Bruzzo/Daylight, for The New York Times) Map of Italy, indicating Verona

Copyright 2010 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Back to Top



1 of 1 DOCUMENT

Copyright 1992 Factiva, a Dow Jones and Reuters Company
All Rights Reserved
**Dow Jones Factiva**

(Copyright (c) 1992, Dow Jones & Co., Inc.)
**THE WALL STREET JOURNAL**
The Wall Street Journal

November 10, 1992 Tuesday

**SECTION:** Pg. A1

**LENGTH:** 1179 words

**HEADLINE:** Juliet of Verona Gets a Lot of Letters From the Lovelorn --- Her Correspondence Secretary Shepherds All Her Replies;
 Star-Crossed Saudi Romeo

**BYLINE:** By Lisa Bannon, Staff Reporter of The Wall Street Journal

**BODY:**

Any man that can write may answer a letter.

-- William Shakespeare

Act II, Scene IV "Romeo and Juliet"

VERONA, Italy -- Fate bequeathed a strange legacy to this small city in Northern Italy.

As the setting for Shakespeare's 16th-century tragedy "Romeo and Juliet," Verona inherited the curiosity of literary scholars, a celebrated theatrical tradition and several hundred thousand tourists a year.

In the bargain, the city also became the star-crossed lovers' capital of the world.

"We don't know how it started exactly," explains Giulio Tamassia, the bespectacled city spokesman for matters relating to Romeo and Juliet. "But one day in the '30s, these letters started arriving -- unprompted -- addressed to Juliet. At a certain point somebody decided Juliet should write back."

What began 60 years ago as an occasional correspondence has grown into an industry. This year more than 1,000 letters from the lovelorn will arrive in Verona addressed to Shakespeare's tragic heroine. Many of them land on Mr. Tamassia's desk, with no more of an address than: Juliet, Italy.

"They tend to be sentimental," says Mr. Tamassia, riffling through stacks of musty air mail in the cramped studio that serves as Juliet headquarters. Inside big pink folders are thousands of sorrowful letters, break-your-heart tales of love and loss. They come from all over -- a teen-age girl in Guatemala, a businessman in Boston, a high-school teacher in London. Some but not many are written by students in Shakespearean language. About 2% of letters received are addressed to Romeo, but Juliet replies.

Juliet of Verona Gets a Lot of Letters From the Lovelorn --- Her Correspondence Secretary Shepherds All Her Replies;
Star-Crossed Saudi Romeo The Wall Street Journal November 10, 1992 Tuesday

"Writing the letter itself is really the first step toward solving the problem," says Mr. Tamassia, a 59-year-old retired businessman who wants it known at the outset that he himself is not Juliet. He is more her correspondence secretary.

"People express feelings in the letters that they would never admit to the person they love. Juliet's story inspires them," he says.

After much rummaging, he pulls out one of his favorites -- describing a modern equivalent of the Montague-Capulet family rivalry.

Hala, an 18-year-old Saudi Arabian, wrote in March that she had fallen in love with the only son of her family's mortal enemy. Years ago, in Pakistan, her greatgrandfather was responsible for the execution of a man who was using his property for smuggling heroin. From that time on, war was declared between the two families.

Now Hala is in love with a descendant of the executed man. "I am torn between the love for my family, who has made me what I am today, and my love for Omer, the man of my dreams," she wrote.

"Please reply quickly . . . my love, my life and my future all depend on your answer."

Mr. Tamassia shakes his head and exhales a long stream of cigarette smoke. "That one was really dramatic. Do you hear the tone? Juliet didn't know what to say at first." The response Juliet finally hit upon gave Hala several options, one of which was to flee Saudi Arabia with her Romeo. Similar advice might have spared Shakespeare's Juliet from her ultimate demise had she just followed Romeo into exile. Mr. Tamassia says Juliet is still waiting to hear how things turned out for Hala and her true love.

"Juliet tries not to give concrete solutions, but helpful advice and a sense of confidence to help the person discover the solution on his own," says Mr. Tamassia. "It's like talking to a friend."

For traumatic or serious psychological problems, Mr. Tamassia says Juliet seeks advice from a local psychiatrist. A local priest -- not unlike Juliet's faithful Friar Laurence -- provides insights into matters spiritual.

A German girl writes mourning the death of her beloved in a recent car accident. "I'm completely desperate, and I can't eat or drink or sleep. What must I do? My life no longer has sense," she writes.

"With letters like this," Mr. Tamassia says, "it's important that the person doesn't feel alone. Juliet would write back that there are difficult moments in life that do not last a whole lifetime, and it is important to have friends to help you through. She should feel like Juliet is her friend."

Many letters, most in fact, are lighter and even playful. "It's a big moment for China right now," he says. "Lots of them are students who want stamps from Italy, or a pen pal, or they want to practice their English." But only about one in 200 is a joke, Mr. Tamassia estimates.

Juliet treats real problems seriously. A Turkish airline steward wrote asking for help in getting a visa for his Chinese girlfriend so she could come to Istanbul to marry him. Mr. Tamassia says Juliet wrote to the Turkish embassy in Rome to see what could be done. "We're still waiting to hear what happened," he says, adding that sometimes Juliet will continue a correspondence until a problem is resolved.

Juliet may have been only 12 years old when she pledged her love to Romeo, but Mr. Tamassia nevertheless believes her to be a wise counselor. "She had a very clear idea of her will and desire. She was a mature girl."

He also believes in Juliet's actual existence; she isn't just a fictional creation. Historians disagree among themselves about whether the Shakespeare play is grounded in fact, but the Veronese claim that the presence of Montagues (Montecchi in Italian) in Verona through the centuries lends credence to the story.

Mr. Tamassia, who is married and has two daughters, just happened into his involvement with Juliet and the heartsick. A Verona city clerk who had helped Juliet answer letters for years quit suddenly in the mid-1980s. In the absence of city money to continue the job, Mr. Tamassia, who had retired from the candy business, volunteered to fill the void.

He and Juliet have four student volunteers from the University of Verona who translate English, French, German, Spanish and Russian letters. Turkish and Chinese are more of a problem. "I found a Turkish NATO commander who helps out when he's not too busy," he says. "The local Chinese restaurants will usually lend a hand for Chinese."

Juliet of Verona Gets a Lot of Letters From the Lovelorn --- Her Correspondence Secretary Shepherds All Her Replies;
Star-Crossed Saudi Romeo The Wall Street Journal November 10, 1992 Tuesday

Mr. Tamassia himself picks up the tab for postage, office rent, Juliet stickers, post cards and lunch for visiting journalists.

"Destiny left us this responsibility --- somebody's got to do it," Mr. Tamassia says.

A foreign correspondent for an American newspaper recently decided to give Juliet a try and wrote a letter asking advice on the difficulties of maintaining a long-distance relationship. Three weeks later, there came the following reply:

"If your Romeo is cast in the same mold as you are, there are no distances. And it's not a given that your two careers will always be in different places. You will have an intense life of work, of expectations, of enthusiasm that only love can offer. Yes, it will be hard to have a happy ending, but I almost envy you the chance."

Juliet's signature on the letter bore a resemblance to Mr. Tamassia's own scrawl.

"It doesn't matter who writes the letters," Mr. Tamassia says, giving away nothing. "It matters what they say."

(See related letter: "Letters to the Editor: She's a Young Thing, Juliet, but Nubile" -- WSJ Dec. 15, 1992)

921110-0034

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

 **LexisNexis**®

1 of 3 DOCUMENTS

Copyright 2002 The Washington Post

**The Washington Post**

**washingtonpost.com**

The Washington Post

February 14, 2002 Thursday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 1278 words

**HEADLINE:** In Fair Verona, Answers for the Lovelorn

**BYLINE:** Daniel Williams, Washington Post Foreign Service

**DATELINE:** VERONA, Italy

**BODY:**

This graceful river town in northern Italy where William Shakespeare set "Romeo and Juliet" is awash in the legend of the star-crossed lovers. Not only are hotels named after the pair, but also a perfume, a motorcycle racecourse, a campground and a canned fruit company. A bakery makes Romeo and Juliet cakes, and a candy company turns out "Juliet Kisses."

City fathers had the foresight a few decades ago to "identify" the family homes of Romeo and Juliet, along with Juliet's grave. A tomb for Romeo remained somehow undiscovered. He gets short shrift in Verona, even though he paid just as high a price for his love as Juliet. In any case, the sites have become magnets for 2 million tourists a year.

Verona's identity is so bound up in the tragic tale that the post office receives about 5,000 letters a year to Juliet, who has become a kind of universal Miss Lonelyhearts for troubled lovers. The Juliet Club has taken up the task of answering each and every letter, many of which are addressed simply to Juliet, Verona, Italy.

But, what ho? That's not a Juliet answering all those letters but . . . a Giulio. Giulio Tamassia, to be exact, president of the Juliet Club. He and others in the club see the chore as a civic duty. "This is a myth. It's bigger than truth," Tamassia said.

The letters are written earnestly and are usually melancholy tales worthy of Shakespearean treatment: parental meddling in teenage love, battles of lovers against intolerance and mean teachers, the sorrows of misarranged marriages and unarranged divorces, and the inevitable letdown of one-night stands.

"After reading so many letters, you are impressed with the perseverance of people in love. There are so many difficulties, yet they want to go on, to succeed," said Tamassia, who once managed a bakery outside the city. He and a group of friends founded the Juliet Club 30 years ago to promote civic pride, culture and tourism. The club took up the letter-answering chore a decade ago.

The letters come from all over. Recently the Islamic world and Eastern Europe have become burgeoning sources of woeful correspondence. Marinella Fedrigoli, a psychologist on a team of seven multilingual "Juliet secretaries" who sift through the letters, said problems of the heart haven't changed much in the past 10 years.

"People consistently need advice on how to express their love, how to deal with betrayal, how to find their Romeo or Juliet," she said. "However, I have noticed one trend in 10 years. People are more alone. They have less and less chances of expressing themselves to others. Juliet seems to be their last hope."

The secretaries are at a loss as to why Juliet should become a recipient for such pleas. You may recall that in Shakespeare's play, Juliet Capulet was a teenage girl who fell hard for Romeo Montague, a smooth-talking guy she met at a masked ball. Her dysfunctional parents, engaged in a meaningless feud with Romeo's equally hateful family, objected and tried to set her up with an establishment type named Paris. Romeo seemed to engage mainly in street brawls and climbing balconies. It didn't help that he knifed to death one of Juliet's cousins.

Juliet tried to trick everyone by taking drugs and pretending to be dead, to avoid life with Paris. Romeo, being none too swift, actually thought she was dead and took poison, which of course apothecaries of the time willingly sold to distraught teenagers. Juliet, having made a mess of things, stabbed herself with a dagger.

Are these the kind of people you want advice from?

"Our letter writers think Juliet will understand their feelings," said Giovanna Tamassia, Giulio's daughter and another "secretary."

The letters show the amorous misadventures of different nationalities. Americans, for example, frequently write about problems of interracial and interfaith relationships. The current American vernacular is a bit less elegant than Elizabethan English. Americans seem not to have problems, but "issues." They have trouble "relating." They are after practical counsel, as if they were writing to Popular Mechanics. "My girlfriend said she wanted to French kiss. I said okay. What is a French kiss? Just how does it work?" asked one young man.

"We told him he would find out naturally," said Giovanna Tamassia.

It is also not above Americans to offer advice to Juliet and her Romeo, much like people in a Jerry Springer audience. "You two could have worked something out," a high school student counseled. "Other than faking your death, you could have married Paris, sent word to Romeo, run off and 'lived happily ever after.' "

Europeans are more flowery in their letters and more willing to air their mental anguish. A Finn told of how he carried the guilt of a marriage breakup for decades. A working German woman was torn between love of a passionate but noncommittal man, who understood her need to labor and travel, and a stable, marriageable type who was "boring."

Further afield, someone who identified himself as the "Prince of Rwanda" asked how to meet a girl on a trip to Italy (Juliet doesn't do matchmaking). From Algeria, a woman wrote of being driven out of her in-laws' house on suspicion of having an extramarital affair. In Serbia, "the economic crisis goes on. . . . There's no space for love!" In Turkey, a social worker fell in love with a poor female rag-picker at a garbage dump. His parents wouldn't accept the engagement.

A few contemporary twists have started to emerge. Cyber-lovers lament the loss of an e-mail address. Same-sex couples have begun to write in. "My Romeo is a Juliet," wrote an enthusiastic Frenchwoman.

"We answer all letters," Fedrigoli said. "Juliet doesn't judge."

Love Capital of the World is perhaps an unsuitable title for Verona. Its 250,000 inhabitants are not considered particularly passionate by Italian standards. Giulio Tamassia noted that Veronese are noted for their closed nature. "We have a hard time smiling," he said. Veronese are hard-nosed business folks. Indeed, the promotion of the Romeo and Juliet cult was a rather recent event, brought about with an eye toward commerce.

In the 1930s, Hollywood technicians visited the city to study its architecture in preparation for a Romeo and Juliet film by MGM. The ensuing craze prompted the city's museum director to restore a house that had been purchased by the city early in the century and was reputed to belong to the Capulets. There is no evidence that such a family ever lived in Verona. A supposed Montague house is privately owned.

Juliet's house became a big draw for tourists. A bronze statue of Juliet was placed in the courtyard. Visitors rub her right breast for good luck. Amorous couples scratch and paint hearts and initials on the facade of the compound and the

In Fair Verona, Answers for the Lovelorn The Washington Post February 14, 2002 Thursday

walls beneath an arch. Local businessmen lived up to their dour reputation by campaigning to have the graffiti erased -- to them, the marks were an eyesore.

Visitors mount the famed balcony, whose marble was actually put there in the 1930s, and reenact the scene in which Romeo climbs up to Juliet's bedroom. "Jack, Jack, wherefore art you, Jack?" bellowed a British woman the other day to her rather paunchy sidekick below.

Visitors fill guest books with lovey-dovey messages -- some are even cheery. "I have found my Juliet -- she is my wife, Luz," wrote a Mexican visitor.

Of course, there's always a dissenter in the crowd. "Never kill yourself for a man!" admonished one messenger.

You can bet that a sentiment like that won't be found in the winner of the Most Beautiful Love Letter Award, which the club gives each year on St. Valentine's Day. The prize: a trip to Verona.

**LOAD-DATE:** February 14, 2002.

# EXHIBIT B



-- Advertisement --

http://www.variety.com/index.asp?layout=print_story&articleid=VR1117952968&categoryid=1238

To print this page, select "PRINT" from the File Menu of your browser.

**Posted: Mon., Oct. 30, 2006, 9:00pm PT**

# Winick takes 'Juliet' jaunt

## Pic set to climb Summit's balcony

### By MICHAEL FLEMING

*A correction was made to this article on Oct. 31, 2006.*

Summit Entertainment has acquired screen rights to the upcoming book "Letters to Juliet" and will develop it into a film to be directed by Gary Winick.

Summit's Patrick Wachsberger and Eric Feig will produce with Ellen Barkin and Caroline Kaplan at Applehead Pictures, the production company Barkin runs with her brother, George.

Winick, who stepped up from the indie "Tadpole" to the romantic comedy "13 Going on 30," just completed "Charlotte's Web" for Paramount Pictures.

To be published Wednesday by Stewart, Tabori & Chang, "Letters to Juliet" -- written by Lise and Ceil Friedman -- is a compilation of missives that lovelorn people all over the world have written to storied star-crossed lover Juliet Capulet. The letters find their way to Verona, Italy. Book explains who are the volunteers who've been answering the missives for 70 years.

A writer will be set shortly to use the fact-based tale to craft a contemporary romance film.

Summit has stepped up as a financier and producer, with films that include the Paul Haggis-directed "In the Valley of Elah," which shoots in December with Tommy Lee Jones and Charlize Theron. Summit is also co-financing "The Tourist," which is in production and stars Hugh Jackman, Ewan McGregor and Michelle Williams. Summit, which is coming off the dance pic "Step Up," will make overseas deals on the Haggis pic and "The Tourist" at AFM.

Read the full article at:
http://www.variety.com/article/VR1117952968.html

# EXHIBIT C



Remember Me

Furry Vengeance

Letters To Juliet

**Letters To Juliet**
Release Date: May 14, 2010

**Director:** Gary Winick
**Cast:** Amanda Seyfried, Vanessa Redgrave
**Producer:** Mark Canton, Ellen Barkin, Carolina Kaplan

When a young American (Amanda Seyfried) travels to the city of Verona, home of the star-crossed lover Juliet Capulet of Romeo and Juliet fame, she joins a group of volunteers who respond to letters to Juliet seeking advice about love. After answering one letter dated 1951, she inspires its author (Vanessa Redgrave) to travel to Italy in search of her long-lost love and sets off a chain of events that will bring a love into both their lives unlike anything they ever imagined.

Terms of Use    Privacy Policy

TM & © 2009 Summit Entertainment, L.L.C. All Rights Reserved.

# EXHIBIT D

# EPSTEIN, LEVINSOHN, BODINE, HURWITZ & WEINSTEIN, LLP

### ATTORNEYS AT LAW

1790 BROADWAY – 10TH FLOOR
NEW YORK, NEW YORK 10019-1412

**FAXED**

TELEPHONE: 212 262 1000

FACSIMILE: 212 262 5022

DIRECT EMAIL:

ROBERT J. EPSTEIN
MARK A. LEVINSOHN
SUSAN H. BODINE
ANDREW P. HURWITZ
JOEL H. WEINSTEIN
JAMES D. ARNAY
ANDREA F. CANNISTRACI
ALISON S. COHEN

BENJAMIN C. FELDMAN
ALAN N. SKIENA
SAGUIT SAAD*
MICHAEL P. OVERN
DOUGLAS C. BERNHEIM
NATALIE D. STANFORD
MATTHEW L. FINKELSTEIN*
JOSHUA M. SANDLER**

\* Also Admitted in NJ
\*\* Admitted in CA Only

June 14, 2006

**By Facsimile (212-279-8863) & Messenger**
Ms. Wendy Sherman
Wendy Sherman Associates Literary Agency
450 7th Ave, Suite 3004
New York, NY 10123

*Re: Letters to Juliet*

Dear Wendy,

I am writing on behalf of my clients Rigas Entertainment Ltd., and Ellen Rigas, with respect to the upcoming book, *Letters to Juliet*, by Lise and Ceil Friedman, whom I believe are your clients.

As I told you when we spoke on the telephone several weeks ago, my clients are the exclusive owners of the rights to create fictionalized motion pictures and/or books based on the Club de Guilietta and the life story, as it pertains to the Club, of Giulio Tamassia. They are currently in active development on such a motion picture project.

Consequently, any attempt to create a fictional motion picture or book pertaining to the club will specifically infringe on the rights of my clients. Such rights will be rigorously defended. We hope that the foregoing will be useful to your clients with respect to business and creative matters relating to their book, *Letters to Juliet*.

Sincerely,

Susan H. Bodine, Esq.

cc: Ellen Rigas

SHB/fpg

# EXHIBIT E

## GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

437 MADISON AVENUE

NEW YORK, NY 10022-7302

(212) 907-7300

FAX (212) 754-0330

ROBIN E. SILVERMAN, ESQ.
DIRECT DIAL NO.: (212) 907-7381
DIRECT FAX NO.: (212) 754-0330
EMAIL ADDRESS: RSILVERMAN@GOLENBOCK.COM

January 9, 2007

**VIA FEDERAL EXPRESS**

Lise and Ceil Friedman
c/o Wendy Sherman Associates Literary Agency
450 Seventh Avenue, Suite 3004
New York, NY 10123
Attention: Ms. Wendy Sherman

Ms. Wendy Sherman
Wendy Sherman Associates Literary Agency
450 Seventh Avenue, Suite 3004
New York, NY 10123

Mr. Michael Jacobs
CEO
Harry N. Abrams, Inc.
115 West 18th Street
New York, NY 10011

        *Re:*     *Exclusive Rights to the Story of, and Consulting Services of, the Club di Guilietta and Mr. Guilio Tamassia*

To Whom It May Concern:

        We are counsel to Rigas Entertainment Ltd. and its principal Ellen Rigas Venetis (collectively, "REL"), and write to you in connection with the apparent violation of certain of REL's rights as such were acquired by REL under an Option and Consulting Services Agreement dated as of May 3, 1994 ("the Agreement") that REL had entered into with Mr. Guilio Tamassia ("Tamassia") and the Club di Giulietta (the "Club"). As Wendy Sherman has been previously advised, pursuant to REL's exercise of the option contemplated in the Agreement, REL has been

362425.4

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

granted exclusive print publication and audio-visual rights (and all allied and ancillary rights, including, without limitation, publicity, merchandising, albums and the like) in and to the Club's story and Tamassia's life story (as such relates to the Club), in perpetuity. Pursuant to this Agreement, Tamassia and the Club also committed to an exclusive consulting arrangement with REL.

Upon learning that Lise and Ceil Friedman had elected to write a book about the Club, Susan Bodine, Esq. (entertainment counsel for REL) contacted the authors' agent, Wendy Sherman to inform her of REL's exclusive rights in the project pursuant to the Agreement, and to express concerns that the proposed book could violate REL's rights. Notwithstanding this warning, Lise and Ceil Friedman elected to move forward with the book *Letters to Juliet*, recently published under the Stewart, Tabori & Chang imprint of Harry N. Abrams, Inc. (the "Book").

We now have had an opportunity to review the Book and believe that the concerns expressed by Ms. Bodine to Wendy Sherman were well founded, and that there has been a violation of our client's exclusive rights. Prior to publication of the Book, the authors were put on notice that their work could infringe on REL's rights. Notwithstanding that notice, the Book has since been published in violation of our client's rights (including, without limitation, the exclusive rights acquired by our client for: (i) motion pictures, television, book publishing and allied and ancillary rights in and to the Club and Tamassia's life story as it relates to the Club; and (ii) the exclusive consultancy services of Tamassia and the Club). Indeed, it appears as if the authors have collaborated extensively with Tamassia and the Club in the creation of the Book, as evidenced by the references in the Acknowledgements in the Book thanking Tamassia and the Club not only for "unlimited access" to the archive but also for "submitting to [the authors'] innumerable questions." *Letters to Juliet*, Acknowledgement Section. Also, the Book contains a detailed history of the Club and specifically chronicles Tamassia's involvement therewith (*See, Letters to Juliet*, pp. 101 – 133) evidencing a degree of knowledge that could not have been obtained without violation of our client's rights. Moreover, it is our understanding that the authors and Harry N. Abrams, Inc. have shopped the film rights to this Book in further dereliction of our client's rights. The intentional and brazen disregard of our client's rights is astonishing, particularly given that notice was provided to Ms. Sherman prior to publication of the Book.

We hereby demand that you immediately cease and desist from further violation of our client's rights and provide us with copies of all agreements that you have entered into in connection with the Book. To date, REL has invested hundreds of thousands of dollars in developing its project, including but not limited to acquiring the underlying rights and hiring writers to develop a script. Your decision to publish the Book, and negotiate film rights based on such Book, have caused REL's expenditure to be for naught. Accordingly, our client hereby demands that you compensate it for its loss. If you are inclined to promptly resolve this matter without the need for legal action, please contact the undersigned within ten (10) business days. Otherwise, we will assume you are not interested in an amicable resolution and will take such further action as our client deems necessary to protect its rights.

Of course, the foregoing is not intended to be a complete recitation of all

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

applicable law and/or facts, and shall not be deemed to constitute a waiver or relinquishment of any of our client's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved. REL expressly reserves its right to pursue, without further notice, all available legal remedies including, but not limited to, the recovery of compensatory and punitive damages, costs and attorneys' fees associated with this matter.

Sincerely,

Robin E. Silverman

cc:   Mr. Erik Feig
      Mr. Patrick Wachsberger
      Ms. Ellen Barkin
      Ms. Caroline Kaplan
      Ms. Ellen Rigas Venetis
      Susan Bodine, Esq.

# EXHIBIT F

### GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

437 MADISON AVENUE
NEW YORK, NY 10022-7302

(212) 907-7300
FAX (212) 754-0330

ROBIN E. SILVERMAN, ESQ.
DIRECT DIAL NO.: (212) 907-7381
DIRECT FAX NO.: (212) 754-0330
EMAIL ADDRESS: RSILVERMAN@GOLENBOCK.COM

January 9, 2007

**VIA FEDERAL EXPRESS**

Mr. Erik Feig
Mr. Patrick Wachsberger
Summit Entertainment
1630 Stewart Street
Santa Monica, CA 90404

Ms. Ellen Barkin
Ms. Caroline Kaplan
Applehead Pictures
35 East 62nd St.
New York, NY 10001

> Re:  *Exclusive Rights to the Story of, and Consulting Services of,*
> *the Club di Guilietta and Mr. Guilio Tamassia*

Dear Mssrs Feig and Wachsberger, Ms.Barkin and Ms. Kaplan:

We are counsel to Rigas Entertainment Ltd. and its principal Ellen Rigas Venetis (collectively, "REL"), and write to you in connection with the apparent violation of certain of REL's rights as such were acquired by REL under an Option and Consulting Services Agreement dated as of May 3, 1994 ("the Agreement") that REL had entered into with Mr. Guilio Tamassia ("Tamassia") and the Club di Giulietta (the "Club"). Pursuant to the terms of such Agreement, REL has been granted exclusive print publication and audio-visual rights (and all allied and ancillary rights, including, without limitation, publicity, merchandising, albums and the like) in and to the Club's story and Tamassia's life story (as such relates to the Club) in perpetuity, and has entered into an exclusive consultancy arrangement with Tamassia and the Club.

Upon learning that Lise and Ceil Friedman had elected to write a book about the Club, entertainment counsel for REL contacted the authors' agent, Wendy Sherman, to inform her of REL's exclusive rights in the project pursuant to the Agreement, and to express concerns

362932.4

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

that the proposed book could violate REL's exclusive rights. Notwithstanding this warning, Lise and Ceil Friedman elected to move forward with the book *Letters to Juliet*, recently published by Harry N. Abrams, Inc. (the "Book"). According to an article appearing on Variety.com, Summit Entertainment has acquired film rights to the Book and plans on producing the project with Ellen Barkin and Caroline Kaplan of Applehead Pictures. The decision to move forward with a film project based on the Book is not only regrettable given our client's receipt of exclusive rights from the Club and Tamassia, but also is particularly disturbing given the fact that REL had previously discussed its project with Ms. Kaplan on various occasions over a period of years. Indeed, at one point, Ms. Kaplan even proposed a particular director for our client's project. The involvement of Ms. Kaplan in the current film project suggests that the violation of our client's rights has been intentional and willful.

We hereby demand that you immediately cease and desist from further violation of our client's rights and provide us with copies of all agreements that you have entered into in connection with any projects based on the story of Tamassia and/or the Club so that we may determine the scope of your activity. To date, REL has invested hundreds of thousands of dollars in developing its project, including but not limited to acquiring the underlying rights and hiring writers to develop a script. Your decision to produce a film based on the Book, and the resulting publicity attendant thereto, have caused REL's expenditure to be for naught. Accordingly our client hereby demands that you compensate it for its loss. If you are inclined to promptly resolve this matter without the need for legal action, please contact the undersigned within ten (10) business days. Otherwise, we will assume you are not interested in an amicable resolution and will take such further action as our client deems necessary to protect its rights.

Of course, the foregoing is not intended to be a complete recitation of all applicable law and/or facts, and shall not be deemed to constitute a waiver or relinquishment of any of our client's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved. REL expressly reserves its right to pursue, without further notice, all available legal remedies including, but not limited to, the recovery of compensatory and punitive damages, costs and attorneys' fees associated with this matter.

Sincerely,

Robin E. Silverman

cc:    Ms. Lise Friedman
       Ms. Ceil Friedman
       Ms. Wendy Sherman
       Mr. Michael Jacobs
       Ms. Ellen Rigas Venetis
       Susan Bodine, Esq.

# EXHIBIT G

**Reichman, Jonathan**

**From:** Reichman, Jonathan
**Sent:** Friday, October 03, 2008 9:37 AM
**To:** 'Robin Silverman'
**Subject:** Club de Guilietta

Dear Robin,

Thanks for your September 29 email.

My client Summit Entertainment is indeed proceeding with a film project which relates to the Club de Guilietta. However, as you have been previously advised, this project is based upon sources which do not implicate any purported rights of your clients. Therefore, no authorization is needed or requested from your clients.

The foregoing is without prejudiice to all of Summit's rights and remedies in connection with this matter, which are hereby reserved.

Very truly yours,

Jonathan D. Reichman

---

**From:** Robin Silverman [mailto:rsilverman@golenbock.com]
**Sent:** Monday, September 29, 2008 11:50 AM
**To:** Reichman, Jonathan
**Subject:** Club de Guilietta

Dear Jon,

I hope this email finds you well. Since I have not heard from you in months concerning any potential plans of your clients with respect to their Club de Guilietta film project, I assume that such project is no longer going forward. As you are aware, my clients, Ellen Rigas Venetis and Rigas Entertainment Ltd. ("Rigas"), continue to hold certain rights with respect to the Club de Guilietta and Giulio Tamassia. Accordingly, Rigas would need to authorize any exploitation of such rights by a third party.

In the event that Summit Entertainment has elected to proceed with a project that disregards the rights of Rigas, my clients are prepared to take all appropriate action against any such infringement. As you are aware, my clients have been quite reasonable throughout this process, but they will not permit their rights to be trampled upon by a third party. Therefore, I would appreciate the courtesy of a prompt reply to this email.

Of course, this email is not intended to be a complete recitation of all applicable law and/or facts, and shall not be deemed to constitute a waiver or relinquishment of any of Rigas' rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

Sincerely,

Robin Silverman

*Robin E. Silverman, Esq.*
*Golenbock Eiseman Assor Bell & Peskoe LLP*

10/3/2008

*437 Madison Avenue*
*New York, NY 10022*
*Direct Dial: (212) 907-7381*
*Email: rsilverman@golenbock.com*

IRS Circular 230 Disclosure: To comply with IRS requirements, we inform you that any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used for the purpose of (i) avoiding penalties that may be imposed under the Internal Revenue Code, or (ii) promoting, marketing or recommending to one or more taxpayers any transaction or matter that is addressed herein.

This message contains information that may be confidential or privileged and is intended only for the individual or entity named above.  No one else may disclose, copy, distribute or use the contents of this message.  Unauthorized use, dissemination and duplication is strictly prohibited, and may be unlawful.  All personal messages express views solely of the sender, which are not to be attributed to Golenbock Eiseman Assor Bell & Peskoe LLP and may not be copied or distributed without this disclaimer.

If you received this message in error, please notify us immediately at Postmaster@golenbock.com or call 1-212-907-7300.

10/3/2008

**From:** Robin Silverman [mailto:rsilverman@golenbock.com]
**Sent:** Tuesday, November 11, 2008 3:33 PM
**To:** Reichman, Jonathan
**Subject:** Club di Giulietta

Dear Jonathan,

I have now had an opportunity to discuss your email with my clients. Your strident response is perplexing, to say the least, in light of the underlying facts. While you state that your client's project is "based on sources that do not implicate any purported rights" of my clients, you have set forth no basis for such a position. Moreover, as recently as a few months ago, you advised the attorney for the authors of the book entitled "Letters to Juliet" that your client would want a global resolution of the rights issues surrounding this project, including the resolution of the issues raised by what you now cavalierly refer to as my clients' "purported rights." We regard this complete turnaround as suspect.

Please be advised that, should your client elect to continue to maintain that its activities do not run afoul of my clients' rights, your client is proceeding at its own peril. My clients reserve the right to take all appropriate action in response to such willful violation of their rights, including but not limited to equitable relief and punitive damages.

While my clients believed that it was in both parties' best interests to resolve the rights issues surrounding your

11/12/2008

client's activities amicably, it is now apparent that your client does not share such views. Rest assured that my clients will remain vigilant in protecting their rights, and will take whatever action they deem necessary to protect them.

Sincerely,

Robin E. Silverman

*Robin E. Silverman, Esq.*
*Golenbock Eiseman Assor Bell & Peskoe LLP*
*437 Madison Avenue*
*New York, NY 10022*
*Direct Dial: (212) 907-7381*
*Email: rsilverman@golenbock.com*

---

IRS Circular 230 Disclosure: To comply with IRS requirements, we inform you that any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used for the purpose of (i) avoiding penalties that may be imposed under the Internal Revenue Code, or (ii) promoting, marketing or recommending to one or more taxpayers any transaction or matter that is addressed herein.

---

This message contains information that may be confidential or privileged and is intended only for the individual or entity named above. No one else may disclose, copy, distribute or use the contents of this message. Unauthorized use, dissemination and duplication is strictly prohibited, and may be unlawful. All personal messages express views solely of the sender, which are not to be attributed to Golenbock Eiseman Assor Bell & Peskoe LLP and may not be copied or distributed without this disclaimer.

If you received this message in error, please notify us immediately at Postmaster@golenbock.com or call 1-212-907-7300.

11/12/2008