UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUMMIT ENTERTAINMENT, LLC, )<br><br>        Declaratory Judgment Plaintiff, )<br><br>    against )<br><br>EPV ENTERPRISES, LLC, )<br><br>        Declaratory Judgment Defendant. ) | C.A. No.  10 CV 193 (JSR)<br><br><br>**ANSWER, COUNTERCLAIMS<br>AND THIRD-PARTY CLAIMS<br>OF EPV ENTERPRISES, LLC** |

SUMMIT ENTERTAINMENT, LLC,                )

           Declaratory Judgment Plaintiff,        )

    against                                                  )

EPV ENTERPRISES, LLC,                        )

           Declaratory Judgment Defendant.   )

_____

EPV ENTERPRISES, LLC,                        )

             Counterclaim Plaintiff,           )

    against                                                  )

SUMMIT ENTERTAINMENT, LLC,                )

             Counterclaim Defendant.        )

_____

EPV ENTERPRISES, LLC,                        )

             Third-party Plaintiff,             )

    against                                                  )

APPLEHEAD PICTURES LLC,
CAROLINE KAPLAN, GIULIO TAMASSIA,
CLUB DI GIULIETTA,                             )

             Third-party Defendants.         )

_____

## ANSWER

Defendant EPV Enterprises, LLC ("EPV"), as and for its Answer to the correspondingly numbered paragraphs of the Complaint for Declaratory Judgment (the "Complaint") of plaintiff Summit Entertainment, LLC ("Summit" or "plaintiff"), alleges and avers as follows:

### THE PARTIES

1.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

2.     As construed in accordance with the Stipulation and Order dated February 17, 2010 (Doc. # 7) - - *i.e.*, replacing references to Ergoarts, Inc. "as a named party" with references to defendant EPV - - defendant denies this paragraph of the Complaint.

3.     As construed in accordance with the Stipulation and Order dated February 17, 2010 (Doc. # 7) - - *i.e.*, replacing references to Ellen Venetis "as a named party" with references to defendant EPV - - defendant denies this paragraph of the Complaint.

4.     As construed in accordance with the Stipulation and Order dated February 17, 2010 (Doc # 7) - - *i.e.*, replacing references to Ergoarts, Inc. "as a named party" with references to defendant EPV - - defendant admits the allegations set forth in the first sentence of this paragraph of the Complaint.  Defendant denies the allegations set forth in the second sentence of this paragraph of the Complaint.

### JURISDICTION AND VENUE

5.     This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required.

6.     This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required.

## FACTS

7.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

8.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

9.    Defendant admits the allegations set forth in this paragraph of the Complaint.

10.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint, except defendant admits that Tamassia is the Secretary of the Club di Giulietta, which answers thousands of letters received each year in the City of Verona addressed to "Juliet Capulet."

11.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint, except defendant admits that the newspapers specified in this paragraph have published articles referring to the activities of Tamassia and/or the Club di Giulietta.

12.    The allegations set forth in the first and second sentences of this paragraph of the Complaint attempt to characterize a document - - *i.e.*, the "Book" - - which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the substance, content or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the third and fourth sentences of this paragraph of the Complaint.

13.    The allegations set forth in this paragraph of the Complaint attempt to characterize a film script, and motion picture based on that film script, which speak for themselves.  To the extent that said allegations misstate or mischaracterize the substance, content

3

or import of said film script and motion picture, or cite to the same out of context or in a misleading fashion, they are denied.

14.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

15.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

16.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

## THE EXISTENCE OF AN ACTUAL CONTROVERSY

17.    Defendant admits the allegations set forth in this paragraph of the Complaint.

18.    Defendant denies the characterization "purportedly," but otherwise admits the allegations set forth in this paragraph of the Complaint.

19.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

20.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the substance, content or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

21.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the substance, content or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

22.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the substance, content or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

23.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

24.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint concerning what Applehead believes or "vigorously denies."  In so answering, defendant avers that there were, in fact, direct dealings between Venetis and EPV's corporate predecessor, on the one hand, and Kaplan, on the other hand, concerning EPV's "Juliet film project," as set forth in EPV's Counterclaims and Third-Party Complaint, below.

25.    Defendant denies the characterization "threats," but otherwise avers that it is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

26.    Defendant denies the allegations set forth in the first sentence of this paragraph of the Complaint.  The allegations set forth in the second sentence of this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the substance, content or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.  In answering the third sentence of this paragraph of the Complaint, defendant admits that counsel for the parties have engaged in discussions concerning defendant's legal claims, but otherwise denies the allegations set forth in that sentence.

5

27.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint, except defendant admits that plaintiff purports to proceed as set for therein.

28.     Denied.

29.     Defendant admits the allegations set forth in the first sentence of this paragraph of the Complaint but denies that the nature or scope of the parties' controversy is accurately portrayed by the Complaint or by plaintiff's claims asserted therein; and defendant further avers that the true nature and scope of the controversy between the parties is set forth in defendant's Counterclaims and Third-Party Complaint, below.  Defendant admits the allegations set forth in the second sentence of this paragraph of the Complaint for the reason that plaintiff's "Motion Picture" infringes on defendant's copyright and contract rights, as set forth in defendant's Counterclaims and Third-Party Complaint, below.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the third sentence of this paragraph of the Complaint.

## COUNT I

**Declaratory Judgment – Copyright in the Screenplay and the Motion Picture**

30.     Defendant incorporates herein by reference in their entirety its answers to the preceding paragraphs of the Complaint.

31.     This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required.

32.     Denied.

33.     Denied.

34.     Denied.

6

35.    Denied.

36.    Denied.

37.    Defendant admits that plaintiff seeks the relief described in this paragraph of the Complaint, but denies that plaintiff is entitled to the same.

## COUNT II

### Declaratory Judgment – No Tortious Interference with Contract

38.    Defendant incorporates herein by reference in their entirety its answers to the preceding paragraphs of the Complaint.

39.    This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required.

40.    Denied.

41.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

42.    Denied.

43.    Denied.

44.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

45.    This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required.  To the extent any response is required, defendant denies the allegations set forth in this paragraph of the Complaint.

46.    Defendant admits that plaintiff seeks the relief described in this paragraph of the Complaint, but denies that plaintiff is entitled to the same.

## COUNT III

### Declaratory Judgment – No Tortious Interference with Prospective Economic Advantage

47.     Defendant incorporates herein by reference in their entirety its answers to the preceding paragraphs of the Complaint.

48.     This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required.

49.     Denied.

50.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

51.     Denied.

52.     Denied.

53.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

54.     This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required.  To the extent any response is required, defendant denies the allegations set forth in this paragraph of the Complaint.

55.     Defendant admits that plaintiff seeks the relief described in this paragraph of the Complaint, but denies that plaintiff is entitled to the same.

## COUNT IV

### Declaratory Judgment – No Violation of Tamassia's Privacy or Publicity Rights

56.     Defendant incorporates herein by reference in their entirety its answers to the preceding paragraphs of the Complaint.

57.     Because Count IV has been dismissed pursuant to the Stipulation and Order dated February 17, 2010 (Doc. # 7), no response is required to this paragraph of the Complaint.

58.     Because Count IV has been dismissed pursuant to the Stipulation and Order dated February 17, 2010 (Doc. # 7), no response is required to this paragraph of the Complaint.

59.     Because Count IV has been dismissed pursuant to the Stipulation and Order dated February 17, 2010 (Doc. # 7), no response is required to this paragraph of the Complaint.

60.     Because Count IV has been dismissed pursuant to the Stipulation and Order dated February 17, 2010 (Doc. # 7), no response is required to this paragraph of the Complaint.

## COUNT V

### Declaratory Judgment – No Trademark Infringement

61.     Defendant incorporates herein by reference in their entirety its answers to the preceding paragraphs of the Complaint.

62.     Because Count V has been dismissed pursuant to the Stipulation and Order dated February 17, 2010 (Doc. # 7), no response is required to this paragraph of the Complaint.

63.     Because Count V has been dismissed pursuant to the Stipulation and Order dated February 17, 2010 (Doc. # 7), no response is required to this paragraph of the Complaint.

64.     Because Count V has been dismissed pursuant to the Stipulation and Order dated February 17, 2010 (Doc. # 7), no response is required to this paragraph of the Complaint.

## COUNT VI

### Declaratory Judgment – No Breach of Implied Contract or Idea Misappropriation

65.    Defendant incorporates herein by reference in their entirety its answers to the preceding paragraphs of the Complaint.

66.    This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required.

67.    Defendant admits that there is no contractual relationship between plaintiff and defendant, but defendant otherwise denies the allegations set forth in this paragraph of the Complaint.

68.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in this paragraph of the Complaint.

69.    Denied.

70.    Denied.

71.    This paragraph of the Complaint contains legal argument or legal conclusions to which no response is required. To the extent any response is required, defendant denies the allegations set forth in this paragraph of the Complaint.

72.    Defendant admits that plaintiff seeks the relief described in this paragraph of the Complaint, but denies that plaintiff is entitled to the same.

WHEREFORE, defendant EPV Enterprises, LLC requests that the claims asserted in plaintiff's Complaint be dismissed, or, in the alternative, that judgment thereon be entered in defendant's favor; that the Court award defendant the attorneys' fees and costs it incurred in this action; and that the Court order such other and further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

All or part of plaintiff's Complaint is unripe for determination by this Court.

### Third Affirmative Defense

There is presently no case or controversy concerning Count IV, "Declaratory Judgment – No Violation of Tamassia's Privacy or Publicity Rights."

### Fourth Affirmative Defense

There is presently no case or controversy concerning Count V, "Declaratory Judgment – No Trademark Infringement."

### Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

### Sixth Affirmative Defense

Plaintiff is estopped from raising the claims asserted in its Complaint.

### Seventh Affirmative Defense

Defendant incorporates herein, as a defense to the claims set forth in the Complaint, the allegations and averments set forth in defendant's Counterclaims and Third-Party Complaint, below.

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

EPV Enterprises LLC ("EPV"),[1] by and through its attorneys, Rosenberg & Giger P.C.,

as and for its Counterclaims against Summit Entertainment, LLC and Third-Party Complaint

against Applehead Pictures LLC, Caroline Kaplan, Giulio Tamassia and Club di Giulietta,

alleges and avers as follows:

## NATURE OF THE ACTION

1.      Through the present Counterclaims and Third-Party Complaint, EPV seeks

redress for counterclaim defendant's and third-party defendants' blatant disregard and violation

of EPV's copyright interests and contractual rights in a movie script and project by

collaboratively creating and producing an infringing motion picture entitled "Letters to Juliet,"

presently scheduled for theatrical release in May of 2010 (the "Infringing Film"). The Infringing

Film is remarkably similar in numerous material respects to EPV's movie script (the "Script"),

which EPV presented to third-party defendant Caroline Kaplan, a producer of the Infringing

Film, years prior to the development of the Infringing Film. Both EPV's Script and the

Infringing Film are fictional tales that revolve around third-party defendant Club di Giulietta, an

entity based in Verona, Italy, made up of volunteers known as the "Secretaries of Juliet." The

Club is presided over by third-party defendant Giulio Tamassia, and provides responses to

thousands of letters received each year in Verona addressed to the fictitious character Juliet

Capulet, of Shakespeare's Romeo & Juliet, seeking advice on love.

---

[1] EPV has received by assignment the rights and causes of action at issue in these Counterclaims and Third-Party Complaint, and is, in this regard, the successor to multiple business entities. (See infra ¶ 7.) For ease of reference, the term "EPV" as used in this pleading refers jointly and severally to EPV Enterprises, LLC *and* each of its assignors and predecessors. (Id.)

2.    In the 1990s, EPV contracted and paid for, and thereby became the lawful owner of (1) the exclusive, perpetual film and literary rights in the Club and Tamassia's life story, as it relates to the Club; and (2) the exclusive consulting services of the Club and Tamassia for the production of a film and a book about the Club. Relying upon these exclusive rights, EPV spent hundreds of thousands of dollars developing a film project that was initially entitled (like the Infringing Film) *Letters to Juliet,* including the commissioning of the Script for EPV's contemplated production.

3.    In furtherance of those efforts, EPV described the Script and the project in significant detail to third-party defendant Caroline Kaplan in the late 1990s, when Kaplan was employed by IFC, the Independent Film Channel. At that time, EPV's principal, Ellen Venetis, enjoyed a professional relationship with Kaplan dating back to their introduction in the mid-1990s, including Ms. Venetis' collaboration with Kaplan and IFC on another film, which was released in 2000.

4.    In 2000, in furtherance of EPV's discussions with Kaplan and other employees and representatives of IFC concerning the *Dear Juliet* project, EPV sent a copy of the Script to IFC. Kaplan left IFC sometime after 2002, and, in or about 2005, she co-founded the production company Applehead Pictures, LLC with actress Ellen Barkin. Thereafter, Kaplan, Applehead and defendant Summit Entertainment, LLC developed and produced the Infringing Film, with the approval and the substantial consultation and assistance of Tamassia and the Club.

5.    As detailed below, the Infringing Film infringes EPV's copyrighted Script through its use, *inter alia,* of substantially similar subject matter, characters and plot details. Moreover, the collaboration of the Club and Tamassia with Kaplan, Applehead and Summit on

13

the Infringing Film was a clear breach of EPV's contract rights, tortiously induced by Kaplan, Applehead and Summit.

6.      EPV asserts its present claims to vindicate its copyrights and contract rights, which have been usurped by counterclaim defendant and third-party defendants; to enjoin the release of the Infringing Film; and to recover damages for the injury caused by counterclaim defendant's and third-party defendants' unlawful conduct.

## PARTIES

7.      EPV is a limited liability company duly organized under the laws of the State of Delaware, having its principal place of business in New York, New York. Effective as of December 11, 2009, EPV received by assignment from ErgoArts, Inc., a New York corporation, all copyrights in the Script, all contract rights in the agreements at issue in this pleading and all causes of action asserted herein. ErgoArts, Inc. was formerly known as Ergo Films Inc. I and, prior thereto, as Rigas Entertainment Ltd. On certain occasions during the period of time relevant to EPV's claims asserted herein, ErgoArts, Inc. continued to conduct business under the name Rigas Entertainment. For ease of reference, the term "EPV" as used in the present Counterclaims and Third-Party Complaint shall refer jointly and severally to EPV Enterprises LLC, EgoArts, Inc., Ergo Films Inc. I, and Rigas Entertainment Ltd.

8.      Counterclaim defendant Summit Entertainment, LLC ("Summit") is a limited liability company organized under the laws of the State of Delaware, having its principal place of business in Santa Monica, California.

9.      Third-party defendant Applehead Pictures LLC ("Applehead") is a limited liability company organized under the laws of the State of Delaware, having its principal place of business in New York, New York.

10.    Third-party defendant Caroline Kaplan ("Kaplan") is, upon information and belief, a resident of New York, New York, and is a co-founder and principal of Applehead.

11.    Third-party defendant Club di Giulietta (the "Club") is, upon information and belief, an entity organized under the laws of Italy, having its principal place of business in Verona, Italy.

12.    Third-party defendant Giulio Tamassia ("Tamassia") is a resident of Verona, Italy, and is an officer and/or principal of the Club.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over these counterclaims and third-party claims pursuant to 28 U.S.C. § 1331 as they arise under the laws of the United States, specifically, the Copyright Act, 17 U.S.C. § 501.  The Court has supplemental jurisdiction over EPV's state-law claims pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in this judicial district, *inter alia*, pursuant to 28 U.S.C. § 1391(a)(2) and (a)(3) in that a substantial portion of the events and omissions giving rise to EPV's claims occurred in this judicial district and this is a district in which counterclaim defendant Summit and third-party defendants Applehead and Kaplan may be found.  Venue in this judicial district is also proper pursuant to the operative contractual undertaking between EPV, on the one hand, and Tamassia and the Club, on the other hand, which provides that "any legal suit, action or proceeding arising out of or relating to this Agreement must be instituted in the City of New York, State of New York" and "waives any objection to the venue of any such suit, action or proceeding."

15

## FACTS COMMON TO ALL CAUSES OF ACTION

### EPV's Purchase of Film and Literary Rights in the Club and Tamassia's Life Story

15.     On or about September 20, 1994, EPV entered into an agreement with the Club and Tamassia, dated "as of May 3, 1994," entitled "Club di Giulietta Option and Consulting Agreement" (the "Option Agreement").

16.     In the Option Agreement (at ¶ 2), Tamassia and the Club, for good and valuable consideration, "irrevocably grant to [EPV] an exclusive option for motion picture, television, book publishing and allied and ancillary rights in and to the Club and Tamassia's life story as it relates to the Club" (the "Film & Book Rights").

17.     In connection with their grant of an option in the Film & Book Rights to EPV, Tamassia and the Club also "agree[d] to serve as exclusive consultants to [EPV] in connection with the Picture," defined as "a dramatic film" concerning, *inter alia*, the Club and its operation (the "Consultation Rights").  (Option Agreement ¶ 2(i).)

18.     Pursuant to the terms of the Option Agreement, the grant of the Film & Book Rights and Consultation Rights is an "exclusive arrangement" between the parties.  (Id. ¶ 8.)

19.     The grant by Tamassia and the Club of the Film & Book Rights and the Consultation Rights in the Option Agreement extended "for a one year option period," commencing "upon [EPV's] receipt of a copy of this letter [*i.e.*, the Option Agreement] which has been signed by Tamassia and on behalf of the Club."  (Id. ¶ 2.)

20.     The Option Agreement was executed by Tamassia, both individually and on behalf of the Club, on or about September 20, 1994, and was subsequently delivered to EPV.

21.     The Option Agreement provides that "[d]uring the course" of the parties' agreement, "no other party shall be granted motion picture, television, book publishing, allied

16

and/or ancillary rights in and to the Club, Tamassia's life story as it relates to the Club, or to consulting services of the Club and Tamassia," with two narrow and limited exceptions: (1) "coverage of the Club's activities by the news media"; and (2) "normal and customary advertising and publicity of the Club's activities specifically for fundraising purposes." (Id. ¶ 7.)

22.    On two subsequent occasions, by tendering additional consideration to Tamassia and the Club, EPV availed itself of its contractual right, set forth in the Option Agreement, to "extend the Rights [i.e., EPV's option in the Film & Book Rights and Consultation Rights], each for an additional option period of one year." (Id. ¶ 3.)

23.    On or about September 20, 1997, prior to the expiration of the extended option period, and upon tendering additional consideration to Tamassia and the Club, EPV entered into a Purchase Agreement with Tamassia and the Club, by which EPV "exercise[d] its option," and by which Tamassia and the Club "irrevocably grant[ed] to [EPV] the motion picture, television, book publishing and allied and ancillary rights in and to the Club and Tamassia's life story as it relates to the Club" - - i.e., the Film & Book Rights.

24.    The Purchase Agreement provides (at ¶ 2) that "[a]ll provisions, representations, [and] warranties contained in the Option Agreement shall continue in effect, and shall be added to the provisions, representations and warranties contained in this Purchase Agreement." By this provision, the Option Agreement's grant, inter alia, of the exclusive Consultation Rights to EPV was incorporated into, and became a substantive part of the Purchase Agreement.

25.    The Purchase Agreement further provides (at ¶ 3) that the "rights granted to [EPV] shall include the right to use the name of the Club and Tamassia in and in connection with the exploitation of any and all rights granted to [EPV] under the Option Agreement and the

17

Purchase Agreement," including, *inter alia*, the exclusive right, as provided in those agreements, to produce a motion picture based on the Club.

26.    The Purchase Agreement expressly incorporates "Paragraph 10 of the Option Agreement," which provides that New York law shall govern its "validity, interpretation and legal effect." (Purchase Agreement ¶ 6.)

**The Creation of EPV's "Dear Juliet" Script**

27.    Soon after entering into the Option Agreement, EPV commenced development of a screenplay (*i.e.*, the Script) for a fictionalized motion picture that incorporates the story of the Club and Tamassia's involvement in the Club.  Following the execution of the Purchase Agreement, EPV continued its efforts to develop the Script and, more generally, the contemplated film project, in reliance on the exclusive Film & Book Rights and Consultation Rights that it had acquired.

28.    The original title of the Script and the related film was *Letters to Juliet*.  The title was changed to *Dear Juliet* in or about 1998, when EPV hired a new writer to continue developing the Script.  On information and belief, and as is described below, EPV referred to the project by the name *Letters to Juliet* - - the precise name of the Infringing Film - - in meetings and conversations with representatives of IFC, including Kaplan, and in communications with Tamassia and the Club.

29.    During the period 1994 through the present, EPV has spent in excess of $500,000 to develop the *Dear Juliet* project, to commission and acquire rights in the Script and to present and promote the project to producers and film studios.

30.    Briefly summarized, from in or about 2000 (if not earlier) through and including the present, the Script for *Dear Juliet* has included, *inter alia,* the following central elements: an

American couple travel to Verona, where one of them is fully involved in business pursuits, while the other, the protagonist, is largely unengaged, and the couple's relationship is strained as a result. The protagonist subsequently is introduced to the Club and he reluctantly begins assisting in the Club's activities, including reviewing and responding to letters to Juliet that were sent to the Club. While doing so, he discovers certain old letters at the Club, which leads to a quest to reunite the long-separated former lovers who are the subject of the letters, and, as a by-product, to the protagonist's introduction to (and the development of a love interest in) the daughter of one of the former lovers. The two travel into the Italian countryside in their search for the other "lost" former lover, and the story plays out with parallel romantic plots as the protagonist struggles with his troubled marriage, his attraction to his new found compatriot and his quest to reunite the two former lovers, one of whom is dying. During this journey, the protagonist discovers significant lessons about love and relationships, and his application of those lessons to his marriage and life is the culmination of the film.

**EPV's Discussions of *Dear Juliet* with IFC and Defendant Kaplan**

31.     In or about 1995 or 1996, EPV's principal, Ellen Venetis, was introduced to Kaplan at a meeting between the two arranged by a family friend of Ms. Venetis. At the time, Kaplan was an executive at IFC. Following their initial meeting, as an executive at IFC, Kaplan and Ms. Venetis worked together on a film entitled *Songcatcher*, which was released in 2001, for which Ms. Venetis was a producer, Ms. Kaplan was an executive producer, and IFC was an equity investor.

32.     In the mid-to-late 1990s, representatives of EPV participated in a meeting at IFC's offices with Kaplan and other IFC principals. At this meeting, EPV representatives described the details of the *Dear Juliet* project to Kaplan and IFC, including the subject matter,

characters and plot details of the Script. As noted earlier herein, upon information and belief, at this (and/or a subsequent) meeting, EPV referred to the project by the name *Letters to Juliet*.

33.    Further discussions between Kaplan and EPV concerning the *Dear Juliet* project occurred in the late 1990s, at the South by Southwest music and film festival in Austin, Texas, during which Wendy Sax, the Director of Development for EPV, met with Kaplan. Kaplan responded favorably to the project during these discussions.

34.    In or about 2000, EPV sent a copy of the Script for *Dear Juliet* to IFC.

35.    IFC generally invests in fully developed scripts that are ready - - or nearly ready - - to commence production. Toward that possible end, and facilitated by their ongoing relationship with EPV, IFC and Kaplan expressed substantial interest in the *Dear Juliet* project and began assisting EPV with its development of the film. In this regard, Kaplan suggested a list of potential writer-directors for *Dear Juliet*, one of whom representatives of EPV met with on several occasions.

36.    EPV and IFC met on a number of subsequent occasions to discuss the *Dear Juliet* project, and IFC and Kaplan responded favorably to the Script and to the concept. As noted above, IFC generally invests in fully developed scripts and, as such, it did not make any formal commitment to the *Dear Juliet* project, as it remained in the development stage.

37.    Until it learned that the Infringing Film, *Letters to Juliet*, had commenced production, EPV continued to actively develop and pursue its *Dear Juliet* film project.

**The "Letters to Juliet" Book**

38.    In or about May of 2006, EPV became aware, for the first time, that a book entitled *Letters to Juliet* (the "Book") - - *i.e.*, the original title of EPV's Script - - was scheduled to be published in the Fall of 2006 by Abrams Stewart, Tabori & Chang, a publishing imprint of

Harry N. Abrams, Inc.  At the same time, EPV learned that the authors of the Book, Lise and Ceil Friedman, were working with an entertainment agent to secure a film deal based on the Book.

39.     Upon learning this information, Ms. Venetis immediately wrote to Tamassia on behalf of EPV to express EPV's concern about the Book and Tamassia's apparent assistance with its creation.  Specifically, EPV expressed concern that the Book might have been created in derogation of EPV's Film & Book Rights and Consultation Rights, and might otherwise infringe on EPV's rights and interests in *Dear Juliet*.

40.     In response to EPV's correspondence, Tamassia, on behalf of the Club, acknowledged that he had consulted with the Friedmans in the preparation of the Book and had provided the Friedmans with access to the Club's facilities and records, but he claimed that neither he nor the Club had any formal "business arrangement" with the Friedmans or their publisher.  In addition, Tamassia offered his understanding that the Book would be a non-fiction history of the phenomenon of the Juliet letters and the Club's role in that history.

41.     On or about June 14, 2006, an attorney representing EPV formally advised the Friedmans' literary agent, Wendy Sherman, of EPV's ownership of the Film & Book Rights and its "active development" of the motion picture *Dear Juliet*.  Through that letter, Ms. Sherman and her clients, the Friedmans, were placed on express notice that "any attempt to create a fictional motion picture or book pertaining to the club will specifically infringe on the rights" of EPV.

42.     The Book was published and released to the market in or about November of 2006.  The Book purports to be a non-fiction history of the Juliet letter phenomenon, and includes a detailed history of the Club, including Tamassia's involvement therein.

21

43.     In the Acknowledgements of the Book, the Friedmans specifically recognize and thank Tamassia and the Club for their "unlimited access" to the Club's archive and for "submitting to [the Friedmans'] innumerable questions." In addition, the Book contains several quotes from Tamassia and other Club members and reprints numerous letters addressed to Juliet from the Club's archives.

## The Infringing Film *Letters to Juliet*

44.     In the Fall of 2006, prior to the release of the Book but, upon information and belief, after their receipt of EPV's notice, the Friedmans, through their literary agent, Ms. Sherman, transferred certain film rights in the Book to defendants Summit and Applehead, the latter of which was co-founded and managed by third-party defendant Kaplan.

45.     On information and belief, at or about the time that they acquired film rights in the Book, Summit and Applehead began development of a fictional film entitled *Letters to Juliet* - - *i.e.,* the Infringing Film - - with Kaplan acting as a producer thereof.

46.     In January of 2007, after learning of the Friedmans' transfer of film rights in their Book to Summit and Applehead, counsel for EPV provided notice to Tamassia, the Friedmans, Ms. Sherman, Harry N. Abrams, Inc., Summit and Applehead that the purported transfer of those film rights and the contemplated production of the Infringing Film violated EPV's Film & Book Rights (and, potentially, the Consultation Rights), which EPV had acquired pursuant to EPV's Purchase Agreement with Tamassia and the Club. In addition, EPV's correspondence to Summit and Applehead specifically noted that Ms. Kaplan was aware of the Script from her prior discussions with EPV's representatives.

47.     In response to EPV's January 2007 correspondence, Tamassia and the Club averred that they had no knowledge of the sale of film rights in the Book; denied the existence of

any agreement between them and Summit, Applehead or any other film company; and represented that they had not assisted or consulted with, and would not assist or consult with, Summit or Applehead in the production of the Infringing Film. Despite these express representations, as is set forth in more detail below, Tamassia and the Club *did* authorize and actively cooperate in the production of the Infringing Film.

48.    Summit and Applehead initially failed to respond to EPV's January 2007 correspondence. Subsequently, Summit and Applehead engaged in discussions with EPV, through the parties' respective counsel, concerning the issues that EPV had raised. During the course of the parties' discussions, Summit suggested to EPV that, while it had been exploring a possible film project based on the Club's activities and the Juliet letter phenomenon, it was not actively pursuing the project at that time.

49.    Notwithstanding the foregoing, on information and belief, in connection with certain negotiations between Summit and the Friedmans in or about the latter half of 2007, Summit demanded indemnification from the Friedmans with respect to any claims asserted by EPV against Summit or Applehead arising out of the production of the *Letters to Juliet* film.

50.    In September of 2008, following a period during which Summit and Applehead had not further communicated with EPV regarding their *Letters to Juliet* film project, counsel for EPV wrote to counsel to Summit and Applehead and advised that "Since I have not heard from you in months concerning any potential plans of your clients with respect to their Club de Giulietta film project, I assume that such project is no longer going forward." Contrary to their prior suggestion that the project was not being actively pursued, counsel for Summit and Applehead now responded that "Summit Entertainment is indeed proceeding with a film project

23

which relates to the Club de Giulietta" and informed EPV that Summit and Applehead would be sending representatives to Verona in furtherance of the project.

51.     Despite having received formal notice and confirmation of EPV's Film & Book Rights and Consultation Rights - - and notwithstanding that Kaplan previously had been briefed on EPV's *Dear Juliet* project and had received a copy of EPV's Script - - Summit commenced shooting for the Infringing Film in New York City and Verona, Italy, in mid-2009, with the active consultation and assistance of Tamassia and the Club and with Kaplan acting as a producer. The Infringing Film is being directed by Gary Winick and features the performances of Vanessa Redgrave, Amanda Seyfried, Gael Garcia Bernal and Franco Nero.

52.     On information and belief, during the shooting of the Infringing Film, Tamassia and other members of the Club met with the cast and crew of the Infringing Film; discussed with them the Club and its history; provided access to the Club's facilities and records; and otherwise consulted with and assisted the cast and crew with the production of the Infringing Film.

53.     On information and belief, as of the date of the filing of these counterclaims and third-party claims, all footage for the Infringing Film has been shot and the Infringing Film is now in the final editing and post-production stage. The Infringing Film is presently scheduled for theatrical release in May of 2010.

54.     After learning that the Infringing Film had been shot, knowing of Kaplan's involvement therein, and fearing that the Infringing Film not only was made in derogation of EPV's contractual rights, but might have violated EPV's copyright in the Script, in early August 2009 and continuing through October 2009, EPV requested that Summit provide EPV with a copy of the Script for the Infringing Film or a summary of the story line and characters thereof. Summit refused EPV's request.

55.    Widely disseminated advance marketing and press materials concerning the Infringing Film, including the trailer for the film, describe a story that is remarkably similar to EPV's Script for *Dear Juliet*. According to the published reports, and as confirmed by the screenplay of the Infringing Film, the Infringing Film depicts the story of a young American couple who travel to Verona. The protagonist is largely abandoned by her boyfriend, who is in Verona for business purposes. The protagonist is introduced to, and becomes involved with the Club and comes upon a letter from an older English woman concerning an Italian man who is her long-lost lover. When, at the urging of the protagonist, the older woman arrives in Verona with her nephew on a quest to locate her former lover, she and her nephew join forces with the protagonist, leaving Verona and traveling into the Italian countryside to search for the woman's lost lover. A love interest develops between the protagonist and the nephew, and there are parallel story lines, as the protagonist struggles with her troubled relationship, her newfound attraction for the nephew and the former lovers' efforts to reunite.

### COUNT I
### Copyright Infringement (17 U.S.C. § 501)
### (Against Summit, Applehead and Kaplan)

56.    EPV incorporates herein by reference in their entirety the preceding paragraphs of the present Counterclaims and Third-Party Complaint, as if fully set forth in this paragraph.

57.    On or about December 23, 2009, EPV duly registered the Script for *Dear Juliet* (the "Work") with the United States Copyright Office in accordance with the Copyright Act, 17 U.S.C. § 101, *et seq.* EPV registered the Work in the identical form in which it existed when it was presented to Kaplan and IFC in or about 2000. EPV is the rightful owner of the copyright in the Work.

58.    The Work is an original work of authorship; is not derived from and does not infringe any pre-existing work; and is fixed in a tangible medium (*i.e.,* the written Script).

59.    Counterclaim defendant Summit and third-party defendants Applehead and Kaplan infringed EPV's copyright in the Work by copying and improperly appropriating original elements of the Work that are protected by copyright, and by using those elements in the screenplay and the Infringing Film *Letters to Juliet*.

60.    As alleged earlier herein, Kaplan, a producer of the Infringing Film, obtained direct access to the Work in connection with her meetings and discussions with EPV concerning the Work in the mid-to-late 1990s, while Kaplan was employed at IFC.

61.    The screenplay and the Infringing Film *Letters to Juliet* are substantially similar to the Work. In this regard, EPV notes the following similarities of which it is presently aware, by way of example only and without limitation:

   a.   A young American couple travels to Verona, Italy.

   b.   One member of the couple is in Verona on business, while the other is largely unoccupied, without any particular agenda, but is looking for the next "career step."

   c.   The non-working party (the "protagonist") becomes involved with the Club di Giulietta after being introduced to the phenomenon of the Juliet letters.

   d.   The protagonist's companion works toward the completion of a professional project while in Verona.

   e.   The protagonist begins reviewing and responding to Juliet letters.

   f.   By becoming involved with the Club and the letters, the protagonist becomes aware of a love story between two elderly people who have not seen each other for many years.

   g.   The discovery of a letter or series of letters written between the former lovers many years ago (*i.e.*, in the 1950s) becomes a catalyst for the protagonist to attempt to reunite them.

   h.   The lost lover who must be found lives in the Italian countryside.

   i.   The protagonist travels into the Italian countryside to locate the lost lover of the elderly person who wrote the discovered letter or letters.

j.  As the protagonist travels in the countryside his or her original love interest takes a work-related trip to another city in Italy.

k.  A younger relative of the author of the subject letters accompanies the protagonist on this quest, and a potential new romance develops between the protagonist and this younger relative.

l.  The younger relative is straight laced and reserved and is unhappy with the discovery of the elderly couple's love story.

m.  One of the elderly lovers is dying.

n.  There is a high speed pursuit, as the protagonist, realizing his or her true affection, rushes to claim his or her true love.

o.  There is a balcony scene reminiscent of *Romeo & Juliet* between the protagonist and his or her love interest.

p.  Through the quest and the rekindled love story around which it centers, the protagonist confronts and reconsiders issues that exist in his or her own love life.

q.  The protagonist makes a decision about his or her own love life based on what is learned in the quest to reunite the old lovers.

r.  Both stories include a main character named Sophia.

62.    On information and belief, the Infringing Film contains additional similarities to the Work that will come to light when more detailed information about the Infringing Film is made available.

63.    In the alternative to the foregoing, the screenplay for the Infringing Film, and the Infringing Film itself, are derivative works that are based upon and draw from the Work, and Summit, Applehead and Kaplan infringed EPV's copyright in the Work by creating those derivative works without the consent of EPV.

64.    As a result of Summit's, Applehead's and Kaplan's infringement of EPV's copyright in the Work, EPV has been damaged in an amount to be determined at trial.

## COUNT II
### Theft of Idea / Breach of Implied Contract
### (Against Kaplan and Applehead)

65.    EPV incorporates herein by reference in their entirety the preceding paragraphs of the present Counterclaims and Third-Party Complaint, as if fully set forth in this paragraph.

66.    EPV's creative ideas relating to its *Dear Juliet* film project - - both its ideas concerning plot, setting, characters and the like and its specific ideas as memorialized in the Script (the "Ideas") - - are entirely original and were novel to Kaplan when EPV revealed them to her.

67.    The Ideas are proprietary to EPV and were not publicly available information at the time that they were conveyed to Kaplan.

68.    EPV and Kaplan had a mutual understanding and agreement that, if Kaplan or some entity of which she was an employee, officer or owner, were to use the Ideas, EPV would be compensated monetarily for their value, which understanding and agreement can be inferred, *inter alia*, from EPV's communications with Kaplan, the facts and circumstances surrounding those communications and custom and practice in the film industry.

69.    Kaplan and her company, Applehead, used the Ideas in connection with the development and production of the Infringing Film, but did not compensate EPV for that use, in breach of the implied contract with EPV.

70.    As a result of Kaplan's and Applehead's breach of implied contract and concomitant theft of ideas, EPV has been damaged in an amount to be determined at trial.

## COUNT III
## Breach of Contract
## (Against Tamassia and the Club)

71.    EPV incorporates herein by reference in their entirety the preceding paragraphs of the present Counterclaims and Third-Party Complaint, as if fully set forth in this paragraph.

72.    Through the Purchase Agreement, and its incorporation of the Option Agreement, the Club and Tamassia (1) "irrevocably grant[ed] to [EPV] the motion picture, television, book publishing and allied and ancillary rights in and to the Club and Tamassia's life story as it relates to the Club"; (2) "agree[d] to serve as exclusive consultants" to EPV in connection with EPV's film project; and (3) agreed that "no other party shall be granted motion picture, television, book publishing, allied and/or ancillary rights in and to the Club, Tamassia's life story as it relates to the Club, or to consulting services of the Club and Tamassia," absent two exceptions, neither of which has any application in the present circumstances.

73.    The Purchase Agreement is valid and fully enforceable, and EPV fulfilled all of its obligations under that Agreement.

74.    The Club and Tamassia breached the Purchase Agreement by:  (1) consulting and assisting with the development and production of the Infringing Film; and (2) on information and belief, authorizing Summit, Applehead and/or other applicable parties to utilize the story of the Club, and/or Tamassia's life story as it relates to the Club, in the development and production of the Infringing Film.

75.    EPV has been damaged as a result of the Club's and Tamassia's breaches of contract in an amount to be determined at trial.

29

## COUNT IV
## Tortious Interference with Contract
## (Against Summit, Applehead and Kaplan)

76.     EPV incorporates herein by reference in their entirety the preceding paragraphs of the present Counterclaims and Third-Party Complaint, as if fully set forth in this paragraph.

77.     The Purchase Agreement is a valid and enforceable contract.

78.     Counterclaim defendant Summit and third-party defendants Applehead and Kaplan were made aware of the existence and material terms of the Purchase Agreement, including the exclusive Film & Book Rights and Consultation Rights granted to EPV by Tamassia and the Club, by and through the correspondence and other communications from EPV described above.  Indeed, prior to commencing production of the Infringing Film, Summit and Applehead acknowledged the possibility that proceeding with the Infringing Film might infringe upon EPV's contractual Film & Book Rights and Consultation Rights, giving rise to claims by EPV, when, *inter alia*, they sought indemnification from the authors of the Book against any legal claims asserted by EPV in respect of the film.

79.     As set forth above, Tamassia and the Club breached the Purchase Agreement by authorizing the use of the Club's and Tamassia's stories in the Infringing Film (in breach of the grant of the Film & Book Rights to EPV) and by consulting in the development and production of the Infringing Film (in breach of the grant of Consultation Rights to EPV).

80.     Summit, Applehead and Kaplan induced and intentionally procured Tamassia's and the Club's aforesaid breaches of the Purchase Agreement to aid in the production of the Infringing Film, despite their full knowledge of EPV's Film & Book Rights and Consultation Rights.

30

81.    EPV has been damaged by Summit's, Applehead's and Kaplan's tortious interference with the Purchase Agreement in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, based upon the foregoing allegations and averments, counterclaim plaintiff and third-party plaintiff EPV respectfully demands judgment against counterclaim defendant and all third-party defendants as follows:

A.    Damages in an amount to be determined at trial.

B.    A preliminary and permanent injunction against the copying, publication, release, broadcast or performance of the screenplay for the Infringing Film *Letters to Juliet* and the Infringing Film itself.

C.    An award of EPV's attorney's fees and costs incurred in connection with this action.

D.    Such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

EPV demands a trial by jury on all issues and claims so triable.

Dated:    February 25, 2010
New York, New York

ROSENBERG & GIGER P.C.

By: _____
John J. Rosenberg (RG1206)
Matthew H. Giger (MG3731)
Brett T. Perala (BP0913)
488 Madison Avenue, 10th Floor
New York, NY 10022
Tel (212) 705-4824
Fax (212) 593-9175

*Attorneys for EPV Enterprises, LLC*